

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

———————————————

No. 02-18-00126-CV

———————————————

Jan Mogged, James Richard Fletcher, and Michael Alan Taylor, Appellants and Appellees

v.

Bobby Wayne Lindamood Jr. and JR's Demolition & Excavation, Inc., Appellees and Appellants

On Appeal from the 348th District Court
Tarrant County, Texas
Trial Court No. 348-278342-15

Before the En Banc Court[1]

---

[1]The en banc court for this appeal consists of all current members of the court who are not recused and Chief Justice Brian Quinn (sitting by assignment), who was a member of the panel on original submission and is eligible for assignment to this court. *See* Tex. R. App. P. 41.2(a). The Honorable Bill Meier, former justice of this court, was a member of the panel on original submission. But Justice Meier did not participate in this opinion because his term of office expired on December 31, 2018, and he is not eligible for assignment to the court. *See id.*; *see* Tex. Gov't Code

Memorandum Opinion by Justice Kerr
Concurring and Dissenting Memorandum Opinion by Chief Justice Quinn

Ann. § 74.003(b). Justices Dabney Bassel, Dana Womack, and Mike Wallach are recused. *See* Tex. R. App. P. 16.2.

**MEMORANDUM OPINION ON EN BANC RECONSIDERATION**

After the panel issued its opinion,[2] two of the three appellants moved for rehearing and en banc reconsideration. On our own motion, we ordered en banc reconsideration of this appeal and withdrew the panel's opinion of December 31, 2018 in its entirety; we now substitute the following.

This case involves the Texas Citizens Participation Act. *See* Tex. Civ. Prac. & Rem. Code Ann. §§ 27.001–.011.[3] After Jan Mogged, James Richard Fletcher, and Michael Alan Taylor (collectively, the Mogged Parties) obtained dismissal under the TCPA of defamation-related claims that were filed against them, they appealed the trial court's award of attorney's fees and sanctions—too little, they say. Bobby Wayne Lindamood Jr. complains about the dismissal, arguing that he met his TCPA burden as nonmovant to present clear and specific evidence of each element of his claims. JR's Demolition & Excavation, Inc., the business Lindamood owns, had nonsuited its claims before the trial court ruled on the Mogged Parties' TCPA motion but, like Lindamood, seems to challenge the dismissal. ("Plaintiffs cross-appeal that granting

---

[2]*See Mogged v. Lindamood*, No. 02-18-00126-CV, 2018 WL 6920502 (Tex. App.—Fort Worth Dec. 31, 2018, pet. abated) (mem. op.).

[3]The TCPA was amended in 2019. *See* Act of May 17, 2019, 86th Leg., R.S., ch. 378, H.B. 2730, §§ 1–9 (amending Act of May 24, 2013, 83d Leg., R.S., ch. 1042, §§ 1–3, 5, 2013 Tex. Gen. Laws 2499, 2499–500; Act of May 21, 2011, 82d Leg., R.S., ch. 341, § 2, 2011 Tex. Gen. Laws 961, 961–64). These amendments do not apply to this case. *See id.* §§ 11–12. All our references are to the pre-2019 version.

the TCPA motion was error.") Lindamood and JR's Demolition are fine with the trial court's attorney's-fee and sanctions awards if the dismissal stands.[4]

We will affirm the dismissal of all claims against the Mogged Parties. In light of intervening authority on how trial courts are to assess reasonable and necessary attorney's fees, we will reverse and remand that issue but will affirm the $1,000 sanctions award as being within the trial court's discretion.

## I. Background

In the spring of 2015, one city-council election in Colleyville, Texas, was particularly contentious, pitting Lindamood against Taylor, the incumbent. Among other things, the two men disagreed about the polarizing issue of whether to widen a major thoroughfare in this wealthy suburban town northeast of Fort Worth. Lindamood opposed reconstructing Glade Road, while Mogged and Fletcher were Taylor supporters who agreed with Taylor that Glade Road should be widened. Mogged is married to former Colleyville councilman Chuck Mogged, and Fletcher is a businessman who lives in Colleyville. A political-action committee called Protect Colleyville had been formed to promote the street's widening.

---

[4]Even though JR's Demolition nonsuited its claims, the Mogged Parties had already filed their TCPA motion, so JR's Demolition remained on the hook for attorney's fees and sanctions—hence its inclusion as an appellee to the Mogged Parties' appeal.

**A. Lindamood's stepmother's lawyer passes along to Taylor a 2011 deposition of Lindamood that was not flattering to Lindamood; Taylor shares part of it with his supporters on April 29, 2015.**

This defamation action finds its genesis in a 2011 deposition that Lindamood had given as part of a nasty family-business dispute with his stepmother, Kayla Lindamood, following Lindamood Sr.'s death. During the deposition, Lindamood was questioned about a number of salacious-sounding incidents in which he was or was not allegedly involved to varying degrees.

Kayla's attorney called Taylor on April 27—less than two weeks before the May 9, 2015 Colleyville municipal election—offering information on Lindamood. Taylor referred the attorney to his own lawyer so that the information's "authenticity and legality" could be verified. Two days later Taylor received an email from Kayla's attorney with three deposition transcripts attached, one of which was Lindamood's. After reviewing that transcript, Taylor printed out a seven-page excerpt ("the Handout"). Within these pages, Taylor highlighted in yellow and underlined in red the deposition testimony that he considered important, redacting only the name of Lindamood's stepsister "Mandy"; Taylor then made several copies and gave them to campaign workers who were attending a meeting of the Protect Colleyville PAC later that same day. Except for the highlights and underlining, Taylor did not further annotate the Handout by adding any language or marginal notes to it.

According to Taylor, his supporters at that meeting "agreed that the voters should know this information," but everyone also agreed that "we could not use the

5

sworn testimony in any way. And I did not." Although Mogged was not there, her husband attended the April 29 meeting, obtained a copy of the Handout, and later showed it to her.

**B. While campaigning door-to-door on May 1, 2015, Mogged hints at forthcoming "bad" information about Lindamood.**

Two days after the PAC meeting, Mogged was block-walking in support of both Nancy Coplen, a candidate for another contested city-council race, and the widening of Glade Road, but not specifically in support of Taylor on that occasion. Lindamood's petition alleged that Mogged was "dressed up in clothes in colors that affirmed she was a member of and speaking for [the Protect Colleyville] PAC." Mogged encountered Richard and Linda Newton, who questioned Taylor's character and asked why Mogged would be supporting him. Mogged defended Taylor and cautioned the Newtons that "information existed about Bobby Lindamood that was bad for him." Mogged denied having offered any specifics during this encounter, although the Newtons both asserted that Mogged had referred to something "bad" about a "trip to Las Vegas."

**C. Using the Lindamood deposition excerpts and adding scurrilous marginal commentary, someone works up a negative piece that appears in selected Colleyville mailboxes on May 4, five days before the election.**

Around May 4, an annotated version of the seven-page Handout surfaced in the mailboxes of some Colleyville residents. This mailer was titled "Colleyville Voter Alert" and included underlining and editorializing marginalia—all in red print—such

6

as "The name redacted is an underage family member that chose not to be identified" and "Did 'It' stop because Bobby's Dad walked in while Bobby was sexually assaulting a drunk minor?" Superimposed on the Alert's final page was this language:

42

A. At my house.

Q. Were you married then?

A. Yes, I was.

Q. And your father was upset over these activities, wasn't he?

A. All of them, yes, he was.

Q. Were you aware that Kayla and your father were going to Hawaii in 2001?

A. I heard that they were, yes.

Q. And how did you hear that?

A. That he had told me that they were going to take a trip, and that's pretty much it, that everybody just kind of knew that they were going to take a trip.

Q. If you would grab Exhibit No. 2.

A. Sure.

Q. Do you recognize this to be a true and correct copy of you and your brother's application to set aside an order probating will?

A. Yes, I do.

Q. Okay. You were aware -- do you know who Gary Mankin is?

A. Do I know where he is?

Q. Do you know who Gary Mankin is?

A. Oh, yes, sir, I do.

Q. Who is he?

Bobby admitted to circulating pictures of his penis, sex with a prostitute and sexually assaulting a drunk minor.

These bad acts were done as a married man, in his house, with his wife sleeping in another room.

Is this the type of person you want serving on your City Council?

How bad will the public knowledge of this sworn testimony embarrass the citizens of Colleyville?

Beware, vote wisely!

Bad behavior!
Bad judgment!
Bad for Colleyville!

Although the Alert, like the Handout, contained red underlining, it was not in identical places, nor did the Alert contain yellow highlighting as in the Handout. Also different was the means of redacting Mandy's name: the Handout covered it over with a red-bordered white rectangle, the Alert with a superimposed black rectangle.

The record says nothing about whether Kayla or her lawyer shared Lindamood's deposition with anyone other than Taylor. Lindamood acknowledged that he and Kayla had "a considerable amount of 'bad blood'" between them extending over many years.

No direct evidence is in the record of who created or published the Alert to Colleyville voters, or even whether the creator and publisher was the same person.

## D. On the NextDoor social-media site, Fletcher calls Lindamood a "sexual predator" and cautions against voting for "ethical uncertainty."

Around the time the Alert was published, Fletcher posted this on NextDoor: "Vote for a sexual predator? I don't think Colleyville needs to vote for ethical uncertainty. Vote for Stability. Vote for Taylor."

## E. Lindamood promptly sues for defamation, tortious interference with his business, and conspiracy; two days after filing suit, he loses the election.

On May 7, 2015, two days before the municipal election, Lindamood and JR's Demolition sued the Mogged Parties, the Protect Colleyville PAC, Kayla, and Mandy.[5] Lindamood's petition alleged that the Mogged Parties and the PAC had defamed him;

---

[5]Lindamood nonsuited the PAC less than a month after this case started; he nonsuited Mandy and Kayla in May 2016 and December 2016, respectively.

had tortiously interfered with his business, JR's Demolition, by publishing the Alert; and had conspired to "unlawfully deprive Plaintiffs Bobby [Lindamood] and JR of their reputations by casting false and defamatory statements about them to the general public at large." In addition, Lindamood alleged that on May 4, Fletcher had "disparaged" him in a social-media post by referring to Lindamood as a "sexual predator" and an "ethical uncertainty."

When the votes were counted on May 9, Taylor was reelected.

## II. Trial-Court Proceedings on Motion to Dismiss

The Mogged Parties timely moved under the TCPA to dismiss the claims against them. *See* Tex. Civ. Prac. & Rem. Code Ann. § 27.003. The movants summarized their allegations this way:

> Plaintiffs allege broadly that Taylor is responsible for the Alert,[6] Fletcher made the allegedly defamatory post on the internet forum, and Mogged somehow conspired with them in some manner undefined other than the color of her clothing and ominous-sounding statements that contained no factual claims. Plaintiffs also claim that all Movants published the Alert, although they do not state how, when, where or to whom.

### A. Movants' TCPA affidavits

Each moving defendant submitted an affidavit supporting their collective motion. Fletcher admitted making the NextDoor social-media post, explaining that based on the events described in the Handout, Fletcher "believed that a married man

---

[6]Because Lindamood was unaware of the Handout when he filed suit, he did not base any claims on the Handout, nor did he amend his petition to add it.

who placed his hands on the private anatomy of a woman who is not his wife acted improperly and worried that such a person on Colleyville's City Council could act unethically."

Each movant addressed the Alert. In her affidavit, Mogged stated that "[o]n May 4, 2015, David Medlin [a Lindamood supporter and friend] confronted me and showed me the Alert. That is the first time I saw it." Taylor similarly swore that he "received the Alert in the late evening on May 4, 2015, in my home mailbox." Fletcher averred that the Alert "arrived at my house on May 4, 2015 but I did not view it until May 8, 2015 because I was out of town."

Mogged and Fletcher stated that they had had nothing to do with making, authoring, publishing, editing, discussing, promoting, endorsing, handing out, hand-delivering, or mailing the Alert, nor did they direct or work with anyone to do any of those things. Taylor's TCPA affidavit was essentially the same, with slight variations:

12.　I did not make the Alert.

13.　I did not author the Alert.

14.　I did not publish the Alert to any other person.

15.　I did not edit the Alert or the sworn deposition excerpt of Bobby Lindamood contained in it.

16.　Other than denying the false claim that I created the Alert, I did not discuss the Alert with anyone because I had no knowledge of the Alert prior to receiving it on May 4, 2015.

17.　I did not promote the Alert.

18.　I did not endorse the Alert.

10

19. I did not hand out, hand-deliver, mail or otherwise distribute or publicize the Alert.

20. I did not direct any person to take any actions listed in Paragraphs 12-19 above with the Alert.

Taylor acknowledged in his affidavit that he had received Lindamood's deposition transcript, selected certain pages containing testimony regarding what he termed "legitimate issues that an informed voter would be concerned about," highlighted and underlined portions of that excerpted testimony, and (without explaining why) blocked out Mandy's name where it appeared. These highlighted pages constituted the Handout that Taylor admittedly copied and circulated at the April 29 campaign meeting but with "no text annotations" having been added. Explaining that people at the meeting "agreed that the voters should know this information but we could not use the sworn testimony in any way," Taylor added:

> And I did not [use the deposition testimony]. Instead, because of the rhetoric of the campaign, I believed that if I published the information, I would end up exactly in this situation—with a frivolous lawsuit filed against me, just before Election Day, by Bobby Lindamood to hurt my Election Day turnout on May 9th, and it did.[7]

## B. Nonmovants' discovery requests

Before responding to the TCPA motion, Lindamood and JR's Demolition sought leave to conduct discovery, proposing to serve 80-plus document requests on

---

[7]Taylor had garnered 53.98% of the early vote, but Lindamood won the May 9 day-of vote, 52.74% to Taylor's 47.26%. But because roughly twice as many people had voted early, Taylor won the election, with an overall margin of victory of 3.4%.

each of the Mogged Parties, along with interrogatories. *See* Tex. Civ. Prac. & Rem. Code Ann. §§ 27.003(c), .006(b) (suspending discovery while a TCPA motion is pending unless, "on a showing of good cause," the trial court allows "specified and limited discovery relevant to the motion"). Plaintiffs' discovery motion argued that because each defendant had denied any involvement with creating or publishing the Alert, "even taking the Affidavits at face value, they still raise questions which need to be addressed in order to determine whether Plaintiffs have a prima facie case against them."[8] "Specifically," as Lindamood and JR's Demolition put it, requiring the defendants to produce documents "should not be burdensome *if they are telling the truth* in their Affidavits and their Motion. If the Movants are *not* telling the truth, however, then these documents *will* disclose the prima facie validity of Plaintiffs'" claims.

The trial court ultimately approved a limited number of document requests concerning the Lindamood deposition that Taylor had received on April 29, 2015. In seeking documents relating to "notes, annotations, changes, deletions, and/or comments" that any of the Mogged Parties made to that deposition, Lindamood and JR's Demolition did not ask to examine Taylor's (or anyone's) computer but did define "document" in the production requests to "specifically include electronic documents and Communications, such as, but not limited to, email, voice messages,

---

[8]The discovery motion was later amended, and this sentence read, "Beyond [credibility issues], even taking the Affidavits at face value, they raise questions which need to be addressed in helping the Court determine that Plaintiffs have a prima facie case against Defendants."

postings on social media, and text messages." "Communications" was in turn defined to "specifically include electronic Documents and Communications of any nature, such as, but not limited to, email, voice messages, instant messaging, text messages, postings on social media, wire transfers, and electronic correspondence." The Mogged Parties were also instructed that "[i]f any Documents and Communications cannot be produced in a format that can be shared, Plaintiffs request[] that such Documents and Communications be made available for inspection by Plaintiffs."

## C. Nonmovants' TCPA response and evidence proffered to show a prima facie case

During this time frame, JR's Demolition nonsuited its claims but joined Lindamood in responding to the Mogged Parties' motion to dismiss. The discovery that the trial court had allowed from the Mogged Parties apparently yielded nothing helpful, because the evidence supplied with Lindamood and JR's Demolition's TCPA response consisted of affidavits from Lindamood; Colleyville residents Medlin, Linda Newton, and Richard Newton; and Daniel Fitzgerald, whose affidavit characterized him as an expert in computer programming, computer forensics, and cell-phone forensics. None of those affidavits, nor any argument in the TCPA response, pointed to anything learned in discovery as supporting the existence of a prima facie defamation case.[9]

---

[9]At the later hearing on attorneys' fees, counsel for the Mogged Parties noted that

The affiants did not claim direct knowledge that any of the Mogged Parties had created or published the Alert, but many of them expressed opinion, speculation, and overall certainty that Taylor in particular must have had something to do with the Alert. The Mogged Parties objected to much of the affidavits' contents on various grounds, separately moving to strike Fitzgerald's affidavit, but did not obtain rulings on the objections or motion to strike.

### 1. Evidence regarding Mogged

Lindamood's and JR's Demolition's evidence of Mogged's involvement with the Alert was based on (1) her campaigning while wearing some unspecified colors associated with the PAC, (2) becoming "very defensive" when the Newtons asked Mogged why she would say that Coplen did not want to serve on the city council with Lindamood, (3) telling the Newtons that bad news was forthcoming about Lindamood and a Las Vegas incident, and (4) remaining silent and looking "embarrassed," "stunned," "sheepish," "as though she had been caught red-handed," and with "body language indicat[ing] guilt," when confronted with the Alert on May 4, 2015 by Medlin while Mogged was working at an election table for the PAC.

---

[t]here is absolutely nothing that Defendants gave Plaintiffs in discovery that Plaintiffs used in their response to the motion to dismiss, and Plaintiffs never compelled different answers. They never complained about the answers they got. They never complained about the documents they got. They took what they had, because that's what we gave them, and that's what we had, and today they still say that there's something out there . . . .

14

## 2. Evidence regarding Fletcher

Evidence submitted to counter Fletcher's request for a TCPA dismissal centered on his NextDoor post, which Fletcher did not deny having made. Richard Newton did recount a May 1, 2015 conversation with Fletcher at a Lions Club meeting. Given the timing, though, Fletcher's comments seem to have been about the Handout: according to Newton, "When the election came up and [Fletcher] discovered that I was supporting Bobby Lindamood, he advised 'we have a deposition' but that 'Taylor was advised not to use it.'"

## 3. Evidence regarding Taylor

Lindamood attached to his affidavit a 2006 anti-Taylor editorial that its original author had reposted on May 8, 2015 at the LocalNewsOnly.com website and that had criticized Taylor nine years earlier during a different campaign. Among other things, the 2006 editorial said, "For a guy who declares in bold red ink that he is 'not a developer, home builder or mortgage lender' he sure has been in bed with plenty of them on a fiscal basis."[10] The Newtons' affidavits referred to Taylor's having "owned a business known as Revolution Technology where he maintained significant printing equipment that [they had] personally seen" at some unidentified time and described Taylor as "very proud he could personally produce his own campaign materials and

---

[10]Linda Newton was at some point the editor of LocalNewsOnly.com, a site that the Mogged Parties described as "a Lindamood mouthpiece." The record does not contain a copy of whatever the 2006 editorial might have been referring to as being in "bold red ink."

15

literature." The Newtons' affidavits did not indicate a time frame during which Taylor owned that business or was producing his own campaign literature, but both affidavits referred to Taylor's employment in the present—May 2015—as "currently" an investment advisor for Provident Strategies Group, so it is unclear whether Taylor owned Revolution Technology or "significant" printing equipment during the 2015 campaign.

Linda Newton averred that she had known Taylor since the 1990s and that "[t]he expression used in the Alert '. . . the attorney drilled down on . . .' is a phrase I have heard Taylor use many times before." She further opined that the Alert, "with underlining, highlighting and bold red print is reminiscent of previous Taylor type political ads, bulletins, flyers and handouts I have seen." As did the 2006 editorial attached to Lindamood's affidavit, Linda Newton referred to Taylor's 2006 campaign materials and observed that "[t]he Alert adopt[ed] the same effort to declare in bold red ink as he has done over and over in his political career." She concluded with her "opinion that he authored the 'Colleyville Voter Alert.' The similarities are simply not a coincidence."

According to Medlin's affidavit, Medlin confronted Taylor about the Alert at a May 5, 2015 city-council meeting. When Medlin asked, "'Why did you do this, Councilman Taylor?' [h]e just looked at me and said[,] 'Get out of my way.' Never once did he deny my accusations against him for publishing the Alert." Lindamood,

who was at the same meeting, overheard this exchange and repeated its substance in his own affidavit.

Lindamood's, Richard Newton's, and Medlin's affidavits all stated that they "[did] not see how" the Alert "could possibly be generated without the underlying file or email attachment that only went to Taylor," citing paragraph 6 of Taylor's TCPA affidavit for the "only went to Taylor" idea. But that paragraph stated only that on the morning of April 29, 2015, Taylor "opened an email with three attached deposition transcripts," the third of which was Lindamood's from March 2011. The record does not confirm or refute whether—as part of Kayla's "pent-up venom" and apparent desire to tank her estranged stepson's election chances—either Kayla's attorney, Kayla, Mandy, or someone else altogether might have disseminated the depositions to other people involved in Colleyville politics.[11]

### 4. Expert affidavit regarding the Handout and the Alert

Fitzgerald described himself as having expertise in computer and cell-phone forensics. Fitzgerald reviewed only the Mogged Parties' affidavits, a copy of the Handout, a copy of the Alert, and "three other exemplars of the Alert" received by the Newtons and two other Colleyville residents.

---

[11]Lindamood did not seek discovery from Kayla or Mandy—who were still parties to the lawsuit at the time—in connection with responding to the Mogged Parties' TCPA motion.

As Fitzgerald's affidavit explained, Lindamood's attorneys also gave him "access to additional documents" that were "represented to be copies of original documents produced by Michael Taylor's, Jan Mogged's and James Fletcher's attorneys in response to [Lindamood's] discovery requests." Fitzgerald did not identify what those documents were, did not attach any of them to his affidavit, and did not cite or expressly rely on them in reaching his conclusions.

Fitzgerald described his process of comparing the Handout with the Alert: he enlarged both documents, "corrected the aspect ratio and size differences caused by the scanning and bates stamping of the documents for production," and "then overlaid the documents allowing them to bleed through making the lower document visible through the upper document." After stating that both documents clearly showed computer alteration, Fitzgerald opined, as did Lindamood, Richard Newton, and Medlin, that he "[did] not see how the Alert could possibly be generated without the underlying disk or email attachment that only went to Michael Taylor. (See Taylor Affidavit, Paragraph 6)." Although Fitzgerald did not review Taylor's computer or the electronic files associated with any document, Fitzgerald also gave his opinion that "both documents were manipulated from the same electronic source document."

Discussing the redaction of Mandy's name from both the Handout and the Alert, and the Alert's annotation that "The name redacted is an underage family member that chose not to be identified," Fitzgerald posited this scenario:

18

If Michael Taylor blocked her name from the people he handed [the Handout] to as described in his Affidavit, how did the author of the Alert determine[] she was an underage family member that chose not to be identified? As a forensics expert, I can only conclude that Michael Taylor was the only person who knew her name and contacted her to determine she did not want her name disclosed.

Fitzgerald's affidavit did not explain how his computer-forensics expertise informed or led to this conclusion.

## D. Trial court's ruling; attorney's fees and sanctions

The trial court heard argument on the TCPA motion, allowed post-hearing submissions, and entered its order granting the motion to dismiss in its entirety in late October 2015, reserving for later the issue of attorney's fees and sanctions.

Getting to an order on attorney's fees and sanctions took until September 2016. The Mogged Parties submitted their attorney's-fee and sanctions request in late November 2015, seeking an award of all fees and costs they had collectively incurred ($143,463) and asking for sanctions of "no less than 50% of Defendants' attorneys' fees." The Mogged Parties later supplemented the amount of requested fees as of the February 19, 2016 hearing for a new total of $177,350.[12]

Of that amount, the fees attributed to the Mogged Parties' Fort Worth counsel remained the same since November 2015: $3,490 for the services of John Brender of The Brender Firm and $4,404 for the services of Bradley Poulos of Cantey Hanger

---

[12]This amount did not include costs and other expenses, for which the Mogged Parties sought $1,106 and $6,658, respectively. We round all amounts to the nearest dollar.

LLP.[13] Fees sought by the Mogged Parties' primary counsel at Dallas's Shore Chan DePumpo LLP totaled $169,456 as of February 2016, up from $128,625 in November 2015.

Lindamood vigorously disputed the requested amount, arguing among other things that Shore Chan's Dallas rates were too high for a Tarrant County lawsuit and that the work performed was excessive, and suggested that the trial court award no more than $30,000 in total fees to the Mogged Parties for Shore Chan's and The Brender Firm's work; $1,500 at most for Cantey Hanger's services; and a sanction of no more than $2,000.[14]

In September 2016, the trial court entered an order, directed at both Lindamood and JR's Demolition, and awarded the Mogged Parties the full amounts for Brender's and Poulos's services ($3,490 and $4,404, respectively) and $30,296 for Shore Chan's services, amounts that included "court costs, reasonable attorneys' fees,

---

[13]Poulos was retained and paid by Mogged's insurer.

[14]Much of Lindamood's argument for such a discount turned initially on considerations of "justice and equity" under Section 27.009(a)(1) of the TCPA. But two months after the February 2016 fee hearing, the Texas Supreme Court held that the statutory phrase "as justice and equity may require" modified only "other expenses incurred in defending against the legal action" and not the penultimate "reasonable attorney's fees" phrase. *Sullivan v. Abraham*, 488 S.W.3d 294, 299 (Tex. 2016) (holding that a "reasonable" attorney's fee is "one that is not excessive or extreme, but rather moderate or fair" as determined at the trial court's discretion, "but that discretion, under the TCPA, does not also specifically include considerations of justice and equity").

and other expenses incurred in defending against the legal action." The trial court also awarded conditional appellate attorney's fees along with sanctions of $1,000.

The Mogged Parties requested written findings of fact and conclusions of law, but none were prepared. *See* Tex. R. Civ. P. 296, 297.

### III. Issues on Appeal

The Mogged Parties contend that the trial court abused its discretion in determining attorney's fees and sanctions; they also raise an issue that the trial court prejudiced them by failing to enter findings of fact and conclusions of law under Texas Rule of Civil Procedure 296 even after being notified of past-due findings under Rule 297.

Lindamood[15] contends in his appeal that the trial court erred by granting the TCPA motion to dismiss because he had established a prima facie case that "the statements were libelous per se," that "the Defendants were the perpetrators of the libelous statements," and that actual malice existed; as a result, the award of costs, fees, expenses, and sanctions should be reversed or vacated.

---

[15]We do not consider JR's Demolition to be a proper appellant on whether the motion to dismiss was wrongly granted. JR's Demolition had nonsuited its claims a little over a month after the Mogged Parties filed their TCPA motion and some two months before the trial court entered its dismissal order and has not appealed the trial court's dismissal of its tortious-interference claim. In any event, Lindamood appears to recognize that he is the lone appellant regarding this issue, writing in his opening brief, for example, that "Bobby now turns to his argument on the merits as to his cross-appeal that the case should not have been dismissed under the [TCPA]." Other than being named as an appellant in the notice of appeal, JR's Demolition makes no argument in its name or otherwise tries to join Lindamood's arguments.

We address Lindamood's appeal first.

## IV. Dismissal of Lindamood's Claims

### A. Overview

#### 1. TCPA

As has been recognized many times, the TCPA has dual purposes: protecting First Amendment rights to the full extent of the law while also protecting the right to file meritorious lawsuits. *See* Tex. Civ. Prac. & Rem. Code Ann. § 27.002; *In re Lipsky*, 460 S.W.3d 579, 589 (Tex. 2015) (orig. proceeding); *Smith v. Crestview NuV, LLC*, 565 S.W.3d 793, 797 (Tex. App.—Fort Worth 2018, pet. denied). A defendant in a case that is "based on, relates to, or is in response to a party's exercise of the right of free speech" may seek dismissal under the TCPA, a statute that is to be "construed liberally to effectuate its purpose and intent fully." *See* Tex. Civ. Prac. & Rem. Code Ann. §§ 27.003(a), .011(b).

Dismissal involves two, sometimes three, steps. First, the moving party must show that the legal action is in fact based on, relates to, or is in response to the movant's exercise of free-speech rights. *See id.* § 27.005(b). If so, the burden shifts to the nonmovant (typically the plaintiff) to produce clear and specific evidence of a prima facie case for each element of the claim.[16] *See id.* § 27.005(c). As a possible third

---

[16]In our original panel opinion, the dissent took the position that the TCPA is sufficiently different, both procedurally and philosophically, from summary-judgment proceedings that a TCPA nonmovant should not benefit from a light-most-favorable review of its evidence. *See Mogged*, 2018 WL 6920502, at *12–14 (Kerr, J., dissenting

step, dismissal is required if the movant then shows by a preponderance of the evidence each element of a valid defense to the claim. *See id.* § 27.005(d).

Requiring "clear and specific evidence" at the second step means that the nonmovant must "provide enough detail to show the factual basis for its claim" and must provide enough evidence "to support a rational inference that the allegation of fact is true." *Dall. Morning News, Inc. v. Hall*, 579 S.W.3d 370, 377 (Tex. 2019); *Lipsky*, 460 S.W.3d at 590–91; *see* Tex. Civ. Prac. & Rem. Code Ann. § 27.005(c). The nonmovant may rely on circumstantial evidence—that is, "indirect evidence that creates an inference to establish a central fact," *Hall*, 579 S.W.3d at 377—unless "the connection between the fact and the inference is too weak to be of help in deciding the case." *Lipsky*, 460 S.W.3d at 589. Although the TCPA does not define clear and specific evidence, the supreme court has stated that "clear" means "unambiguous, sure, or free from doubt" and "specific" means "explicit" or "relating to a particular named thing." *Id.* at 590 (quoting *KTRX Television, Inc. v. Robinson*, 409 S.W.3d 682, 689 (Tex. App.—Houston [1st Dist.] 2013, pet. denied)).

---

and concurring); *see also Rogers v. Soleil Chartered Bank*, No. 02-19-00124-CV, 2019 WL 4686303, at *7 n.5 (Tex. App.—Fort Worth Sept. 26, 2019, no pet.) (mem. op.). That is, it seemed to the dissent that the nonmovant's burden under Section 27.005(c) to produce clear and specific evidence of a prima facie case would be lessened by viewing that evidence in a light most favorable to the nonmovant. Although this concern remains, because we conclude that Lindamood's evidence did not establish a prima facie case even under the more lenient summary-judgment review, we need not decide whether a TCPA nonmovant's evidence should be reviewed neutrally or in a more favorable light. *See Rogers*, 2019 WL 4686303, at *7 n.5.

23

If "the term 'clear and specific evidence' refers to the quality of evidence required to establish a prima facie case, . . . the term 'prima facie case' refers to the amount of evidence required to satisfy the nonmovant's minimal factual burden." *Serafine v. Blunt*, 466 S.W.3d 352, 358 (Tex. App.—Austin 2015, no pet.) (op. on reh'g). The supreme court has described a prima facie case in the TCPA context consistently with that concept's long-standing meaning: "evidence sufficient as a matter of law to establish a given fact if it is not rebutted or contradicted." *Lipsky*, 460 S.W.3d at 590 (citing *Simonds v. Stanolind Oil & Gas Co.*, 136 S.W.2d 207, 209 (Tex. 1940)). "Conclusory statements are not probative and accordingly will not suffice to establish a prima facie case." *Better Bus. Bureau of Metro. Hous., Inc. v. John Moore Servs., Inc.*, 441 S.W.3d 345, 355 (Tex. App.—Houston [1st Dist.] 2013, pet. denied) (citing *In re E.I. DuPont de Nemours & Co.*, 136 S.W.3d 218, 223–24 (Tex. 2004) (orig. proceeding)). Likewise, a TCPA nonmovant "cannot rely on speculation to satisfy its burden of proof" of establishing a prima facie case for each element of its claim. *Landry's, Inc. v. Animal Legal Def. Fund*, 566 S.W.3d 41, 63 (Tex. App.—Houston [14th Dist.] 2018, pet. granted).

We review a trial court's ruling on a TCPA motion to dismiss de novo. *Beving v. Beadles*, 563 S.W.3d 399, 404 (Tex. App.—Fort Worth 2018, pet. denied).

### 2. Defamation

To maintain a defamation claim, the plaintiff must prove that (1) the defendant published a false statement of fact to a third person, (2) the statement defamed the

24

plaintiff, (3) the defendant acted with actual malice if (as here) the plaintiff is a public figure or a public official, and (4) the statement proximately caused damages, unless the statement is defamatory per se. *Bedford v. Spassoff*, 520 S.W.3d 901, 904 (Tex. 2017); *Ghrist v. MBH Real Estate LLC*, No. 02-17-00411-CV, 2018 WL 3060331, at *4 (Tex. App.—Fort Worth June 21, 2018, no pet.) (mem. op.).

Candidates for public elective office are public officials for purposes of recovering for defamation and thus must show actual malice. *See Cruz v. Van Sickle*, 452 S.W.3d 503, 516 (Tex. App.—Dallas 2014, pets. denied) (citing *Monitor Patriot Co. v. Roy*, 401 U.S. 265, 271–72, 91 S. Ct. 621, 625 (1971)). Actual malice exists when the defamatory statement is knowingly false or is conveyed with reckless disregard for its truth. *Huckabee v. Time Warner Entm't Co.*, 19 S.W.3d 413, 420 (Tex. 2000). To establish reckless disregard, a plaintiff must show that the defendant subjectively "entertained serious doubts as to the truth" of the statement. *Id.* (quoting *St. Amant v. Thompson*, 390 U.S. 727, 731, 88 S. Ct. 1323, 1325 (1968)); *see Weber v. Fernandez*, No. 02-18-00275-CV, 2019 WL 1395796, at *16 & n.8 (Tex. App.—Fort Worth Mar. 28, 2019, no pet.) (mem. op.). "[T]he mere failure to investigate the facts, by itself, is no evidence of actual malice." *Bentley v. Bunton*, 94 S.W.3d 561, 595 (Tex. 2002).

Defamation per se refers to "statements that are so obviously harmful that general damages, such as mental anguish and loss of reputation, are presumed." *Lipsky*, 460 S.W.3d at 596. Examples of such statements include accusing someone of a crime, of having a foul or loathsome disease, or of engaging in serious sexual

misconduct. *Id.* Whether a statement is defamatory per se is generally a legal question. *Id.* (citing *Hancock v. Variyam*, 400 S.W.3d 59, 66 (Tex. 2013)). We conclude that the Alert's commentary is defamatory per se in its suggestion of sexual misconduct accompanied by a possible crime (the involvement of an alleged minor).

## B. Lindamood did not establish a prima facie case

The parties do not dispute that the TCPA applies to Lindamood's claims, and the Mogged Parties did not plead a defense on which they would bear the burden to counter a prima facie case if Lindamood established one. Our analysis, then, focuses solely on whether Lindamood produced clear and specific evidence of a prima facie case of defamation[17] against any of the Mogged Parties.

### 1. The Handout: not defamatory

As we noted, Lindamood's petition did not allege that he was defamed by the highlighted and underlined Handout that Taylor circulated at the April 29 meeting, and he did not amend his petition after learning of it. But because the Handout was assailed as defamatory in Lindamood's TCPA response and in his appellate briefing, we make clear that we agree with a 1999 California decision that held that adding highlighting or similar emphases to an otherwise accurate document is not

---

[17]Lindamood also sued for civil conspiracy, but because conspiracy is a derivative claim that depends on an underlying tort, if we conclude—as we do—that Lindamood's defamation claim against all the Mogged Parties was properly dismissed, we need not separately analyze his conspiracy claim. *See Weber*, 2019 WL 1395796, at *19 (concluding that because defamation claims failed to withstand TCPA motion to dismiss, conspiracy claims were also required to be dismissed).

defamatory. *Smith v. Maldonado*, 85 Cal. Rptr. 2d 397, 402, 404 (Cal. Ct. App. 1999) (holding that because "highlighting is nothing more nor less than emphasis," it "does not add any commentary, analysis, rhetoric, opinion, or anything else of substance to the statement that is highlighted"). Thus, Taylor's admission that he excerpted pages from Lindamood's deposition, highlighted and underlined passages that he found noteworthy, and shared copies of those pages with others cannot support a defamation claim: Taylor made no affirmative, false statement of fact in the Handout.

To the extent that Lindamood claimed that the Handout defamed him, the trial court correctly, if only tacitly, dismissed any such claim.

### 2. The Alert: defamatory per se—but who published it?

"In a defamation case that implicates the TCPA, pleadings and evidence that establishes the facts of when, where, and what was said, the defamatory nature of the statements, and how they damaged the plaintiff should be sufficient to resist a TCPA motion to dismiss" by demonstrating a prima facie case. *Lipsky*, 460 S.W.3d at 591. Left unsaid in this passage is the almost always obvious element but the one that here is the central mystery: *who* published a defamatory statement? It is axiomatic that the "who" be a party; after all, the first-listed of the tort's elements is that "(1) the defendant published a false statement." *Bedford*, 520 S.W.3d at 904.

We examine below Lindamood's evidence concerning the Mogged Parties to determine whether a prima facie case exists that any of them published the Alert. Because we conclude that Lindamood has not established a prima facie case of

27

publication by one of the defendants, his defamation claim fails in its first essential element, so we need not analyze the additional element of actual malice. *See* Tex. Civ. Prac. & Rem. Code Ann. § 27.005(c) (to avoid dismissal under TCPA, plaintiff must establish prima facie case for "each essential element of the claim in question"). Moreover, without an identifiable publisher of the allegedly defamatory statement, we could not meaningfully analyze actual malice anyway because it is subjective in nature.

### a. Mogged

Mogged knew of the Handout but denied having had anything to do with the Alert, which she maintained she first saw on May 4, 2015, when Medlin showed it to her. Lindamood's evidence concerning Mogged, as we noted earlier, centered on her telling the Newtons that "bad news about Bobby Lindamood is coming out about a trip to Las Vegas" and on Medlin's interpretation of Mogged's reaction when he confronted her with the Alert.

In his 2011 deposition, Lindamood had been asked about an incident in Las Vegas involving a prostitute. Although the Handout (and the Alert) included his denial that he had hired one, Lindamood acknowledged that a prostitute was present in a room with "several people in there, and it was to be funny is what it was." Lindamood also acknowledged interacting with his stepsister Mandy in a sexual manner at his house while he was married and they were both drunk.

Mogged's husband had given her the Handout after the April 29 PAC meeting, and Mogged's comments to the Newtons could have referred to the Handout's

28

contents alone. *Jelinek v. Casas*, 328 S.W.3d 526, 536–37 (Tex. 2010) (stating that where "circumstances are equally consistent with either of two facts, neither fact may be inferred" (quoting *City of Keller v. Wilson*, 168 S.W.3d 802, 813 (Tex. 2005))). Indeed, Mogged said just that in her affidavit: that she had based her statement to the Newtons on the "unannotated excerpt from Bobby Lindamood's deposition transcript" that she had seen, which "described Mr. Lindamood's physical contact with a female who was not his wife and described an incident in Las Vegas with a prostitute." Additionally, Mogged's oblique reference to some imminent "bad news" was not a false statement of fact, nor did it reveal the manner in which such news might be disclosed. And even if she had been alluding to the Alert, that fact would not reasonably imply that Mogged published it.

Mogged's silence and body language as recounted by Medlin are similarly not clear and specific evidence of her having published the Alert. Lindamood relies on cases involving a party's failure to speak up or refute a "definite statement of a matter of fact, affecting a party or his rights, [that] is made in his presence or hearing" and "is of such a nature as to call for a reply." *Miller v. Dyess*, 151 S.W.2d 186, 191 (Tex. 1941). In such circumstances, silence "may constitute a tacit admission of what was said." *See Walker v. Lorehn*, 355 S.W.2d 71, 75 (Tex. App.—Houston [1st Dist.] 1962, writ ref'd n.r.e.).

Here, though, Medlin made no "definite statement of a matter of fact" that called for a response from Mogged if untrue. Medlin confronted a group of women

29

(of which Mogged was one) who were working the PAC election table on May 4, 2015, asking them all, "Why did you all do this, why did you send this out?" According to Medlin, Mogged "looked down in an embarrassed manner and said nothing" even after Medlin told the group that Mogged had talked about "it" at the Newtons' house and "kn[ew] all about it"; he then retrieved a copy of the Alert from another table and returned to hold it in front of Mogged. As Medlin described the interaction, Mogged "remained silent and never said a word in response to my question if she did this."[18] Medlin's affidavit did not describe a definite statement or accusation that "call[ed] for a reply." *Miller*, 151 S.W.2d at 191. We thus conclude that the interaction between Medlin and Mogged does not rise to the level of clear and specific, inference-from-silence evidence, even were we to view that evidence in a light favorable to Lindamood, that Mogged published the Alert.

### b. Fletcher

The only putative connection between Fletcher and the Alert turns on Lindamood's taking issue with Fletcher's credibility about the Handout's attributes. Fletcher's affidavit recited that at the April 29 PAC meeting, Taylor had distributed

---

[18]Things obviously got heated, because the police arrived, at which point Medlin said to them in Mogged's presence, "These guys sent this out about Bobby and I raised my voice. I know they were involved in doing this." The fact that law enforcement became involved makes it equally plausible that Mogged wanted to avoid escalation and so chose not to engage with Medlin. Thus, the principle Lindamood cites—that a party's silence when he was free to speak, in a situation where one would not normally remain silent, might equate to tacitly admitting what was said—does not help in establishing a prima facie case of publication.

and Fletcher had received excerpts from Lindamood's deposition. As Fletcher described that partial transcript, "Some of the text had been highlighted, but it had no annotations, underlining, deletions, or comments in the margins." Seizing upon Fletcher's asserting that the PAC-meeting document lacked any underlining (which the Handout did have) or deletions (also present in the Handout, in the form of redacting Mandy's name), Lindamood argues that

> we *know* this is ***false*** because of what Taylor testified to, and from the Taylor handout . . . . So what *else* is false about Fletcher's testimony? Bobby is entitled to rely on "circumstantial" evidence that Fletcher's conclusory denials of *propagating* the Alert, made as an interested party, are untrue . . . . Fletcher's denial's *lack of credibility* is *specific* prima facie circumstantial evidence he did what he denied.

Lindamood cites no authority for this proposition. In effect, he suggests that because Fletcher ostensibly lied about the Handout, one cannot believe Fletcher when he denied his involvement in the Alert, and his lack of credibility thus constitutes circumstantial evidence that he was involved. A witness's credibility assuredly affects whether one should believe what the witness said and if testimony is not credible, the factfinder is free to reject it. But freedom to reject a witness's testimony about Fact A is not evidence that Fact B exists. *See In re E.V.*, 255 S.W.3d 389, 394 (Tex. App.—El Paso 2008, no pet.) (reviewing child-support order and holding that "[a]lthough the trial judge doubted the credibility of Vieweg's tax returns and was familiar with the location and physical size of Vieweg's business, this does not constitute evidence that Vieweg's income was $1,950 per month," the arbitrary amount chosen by trial court);

*cf. Mathis v. Lockwood*, 166 S.W.3d 743, 745 (Tex. 2005) (noting that discredited testimony is not ordinarily considered sufficient basis for drawing a contrary conclusion).

We conclude that whether we view the evidence neutrally or in a light favorable to Lindamood, he has not established a prima facie case that Fletcher published the Alert.

### c. Taylor

Medlin's and Lindamood's affidavits describe Taylor's silence and lack of rebuttal when on May 5 Medlin confronted him about the Alert after a city-council meeting. According to both affiants, Taylor "just looked down and said nothing," and after Medlin then asked, "Why did you do this, Councilman Taylor?," Taylor's only response was to say, "Get out of my way." For the same reasons we held similar failure-to-deny evidence insufficient to establish a prima facie case against Mogged, we reach the same conclusion concerning this aspect of the allegations against Taylor.

Lindamood's facts otherwise specific to Taylor can be summarized as: (1) Kayla's attorney had emailed Taylor the Lindamood deposition from which Taylor created and circulated the Handout; (2) both the Handout's and the Alert's same seven pages had red underlining in (nonidentical) places, and Mandy's name was redacted in both documents (though in different ways); (3) Taylor had owned printing equipment and had put out some campaign material in 2006 using what was characterized as "bold red ink"; (4) Linda Newton found the Alert's design

32

"reminiscent" of earlier "Taylor type" materials; and (5) she had heard Taylor use the "drilled down on" expression that appears once in the Alert's margins. Lindamood also relied on a computer-forensics expert, Fitzgerald, in an attempt to present clear and specific evidence that Taylor created the Alert.

### i. Lindamood's circumstantial evidence and inferences

The TCPA does not forbid using circumstantial evidence or rational inferences in establishing a prima facie case. *Lipsky*, 460 S.W.3d at 591. But as an overarching proposition, inferences must be handled carefully:

> Circumstantial evidence can establish [a particular fact] but such evidence must "either directly or by reasonable inference" support that conclusion. An inference is not reasonable, however, if it is premised on mere suspicion—"some suspicion linked to other suspicion produces only more suspicion, which is not the same as some evidence." "When the evidence offered to prove a vital fact is so weak as to do no more than create a mere surmise or suspicion of its existence, the evidence is no more than a scintilla and, in legal effect, is no evidence." An inference is not reasonable if it is susceptible to multiple, equally probable inferences, requiring the factfinder to guess in order to reach a conclusion.

*Suarez v. City of Tex. City*, 465 S.W.3d 623, 634 (Tex. 2015) (citations omitted); *see Alarcon v. Alcolac Inc.*, 488 S.W.3d 813, 820–21 (Tex. App.—Houston [14th Dist.] 2016, pet. denied) (holding that circumstantial evidence that defendant manufacturer supplied majority of dangerous product during relevant time frame was insufficient to raise fact issue that plaintiff was injured by defendant's product; theory that earlier quantities of product had been depleted, and thus new supply was attributable to defendant, was not a reasonable inference).

A recent case from our sister court in San Antonio is instructive on the limits of inferences when it comes to identifying who might have defamed someone. *Burgi v. Hartman*, No. 04-17-00501-CV, 2018 WL 3265041 (Tex. App.—San Antonio July 5, 2018, no pet.) (mem. op.). There, a father sued his son's high-school teacher and the teacher's husband (with whom the father worked) for defamation arising out of an anonymous Child Protective Services report. *Id.* at *1. During a high-school EMT-training class run by teacher Mary Jo Hartman, Ronald Burgi's son had recounted for Hartman and his classmates a hunting trip with his father two years earlier during which the son was hit by four pieces of birdshot. *Id.* As the son described that event for the class, Burgi had asked whether he wanted to go to the hospital, but the son chose to first finish hunting. *Id.* Upon seeking medical attention at day's end, Burgi and his son were told that the birdshot was better left in place because surgery to remove it would be more invasive. Hartman then questioned the son further about this incident. *Id.* Two weeks later, police officers showed up at the Burgis' home at 2:00 a.m. for a child-welfare check, explaining that they were investigating a report that the son had recently sustained gunshot wounds in a hunting accident and that Burgi had failed to seek medical attention for over an hour. *Id.*

Burgi based his defamation claims against Hartman on her questioning of his son and then either making the false CPS report or making a false statement to her husband, who made the report himself because of ostensible work-related animus. *Id.* Hartman moved for summary judgment arguing that there was no evidence that she

34

had made the CPS report or encouraged her husband or anyone else to do so. *Id.* at *2.

Affirming the no-evidence summary judgment, the appellate court recited the legal principles forbidding unreasonable inferences based on mere suspicion and equally probable inferences. *Id.* (citing *Alarcon*, 488 S.W.3d at 820, 821). The court then pointed out that other possibilities existed beyond Burgi's two theories of Hartman's liability, including that she could have truthfully reported the discussion to her husband who took it upon himself to make a false report, or that somebody else who knew about the hunting accident made the false statement to CPS. *Id.*

> Based on the circumstantial evidence Burgi produced, a factfinder would be required to guess from at least four possibilities that Hartman made a false statement about Burgi to CPS or to her husband. We cannot say Burgi's circumstantial evidence, taken as true, makes either of the possibilities implicating Hartman more probable than the other two possibilities. Taking Burgi's circumstantial evidence as true, Burgi has only raised mere suspicions that Burgi [sic] made a false statement to CPS or to her husband.

*Id.*

Similarly here, Lindamood's circumstantial evidence that Taylor published the Alert leans too heavily on unreasonable inferences, on speculation, and on mere suspicion. Kayla and her attorney could have shopped Lindamood's deposition around town; someone who saw or got a copy of the Handout could have also received the deposition and created (and published) the Alert from it; and there is

35

nothing to suggest that Taylor was the only one on the receiving end of Kayla's obvious desire to create mischief for Lindamood.

Furthermore, the phrase "drill down on" is neither unique nor unusual. Almost a decade ago it was the first-listed example in an article titled "Glossary: The Most Annoying Business Jargon." *See* https://www.forbes.com/2011/01/06/annoying-business-jargon-entrepreneurs-business_slide.html#3da649ea129e (last visited Nov. 2, 2020). As for Taylor's use of "bold red ink" in campaign materials, that assertion is similarly thin gruel. Without more—such as a sample of Taylor's past materials that might reveal some styles or fonts similar to those in the Alert—we cannot agree that using red ink is a Taylor-specific oddity in the campaign-literature world generally. Moreover, even if one infers that Taylor ginned up the Alert, no evidence links him to having published it by getting it into third parties' hands—and as revealed by the number of defendants who were originally sued, Lindamood's personal and politics-related foes were many.

Additionally, in his motion for leave to conduct discovery before responding to the Mogged Parties' TCPA motion, Lindamood admitted lacking clear and specific evidence that Taylor had published the Alert: "[T]here is good reason to believe that Taylor also had a hand in the creation and propagation of the 'Alert.' However, Lindamood cannot establish this without the discovery which Plaintiffs seek leave to propound." Even after the trial court allowed discovery, Lindamood got no information from any of the Mogged Parties that advanced this particular ball, and

36

Lindamood did not press further by challenging the accuracy or completeness of what was produced.

Nor do the conclusory statements in Lindamood's various responsive affidavits create a prima facie case based on circumstantial evidence or rational inferences that Taylor published the Alert, because "the 'clear and specific' standard in the TCPA at least requires us to reject conclusory claims made by an affiant." *Equine Holdings, LLC v. Jacoby*, No. 05-19-00758-CV, 2020 WL 2079183, at *4 (Tex. App.—Dallas Apr. 30, 2020, pet. denied) (mem. op.) (citing *Lipsky*, 460 S.W.3d at 593); *see MVS Int'l Corp. v. Int'l Advert. Sols., LLC*, 545 S.W.3d 180, 192 (Tex. App.—El Paso 2017, no pet.) (same, and holding, in TCPA context, that conclusory statements are substantive defects that can be raised for first time on appeal); *see also Seim v. Allstate Tex. Lloyds*, 551 S.W.3d 161, 166 (Tex. 2018) (holding that appellate court can review such substantive defects in affidavits even though objecting party failed to obtain trial court's ruling on objections).[19]

At the heart of Lindamood's evidence—from Medlin, Richard Newton, Fitzgerald, and Lindamood himself—is the opinion in all four affidavits that they did "not see how" the Alert "could possibly be generated without" the underlying electronic file, disk, or email attachment containing Lindamood's 2011 deposition

---

[19]Lindamood's argument that the Mogged Parties waived all objections to Fitzgerald's affidavit is thus inaccurate; substantive defects can always be reviewed on appeal.

37

"that only went to" Taylor, inferring that only Taylor could have created *and published* the Alert. Each affiant supported this assertion by citing to paragraph 6 of Taylor's affidavit, which as we explained earlier did not say that the deposition went only to him. In fact, if Taylor himself had claimed that Kayla's lawyer did not provide the deposition to anyone else, that too would have been a conclusory statement—and one lacking a basis for personal knowledge to boot. *See, e.g., MVS Int'l*, 545 S.W.3d at 192 ("A statement is conclusory if it provides a conclusion but no underlying facts in support of the conclusion."); *Humphreys v. Caldwell*, 888 S.W.2d 469, 470 (Tex. 1994) (holding that an affidavit showing no basis for personal knowledge is legally insufficient). And "[b]are, baseless opinions do not create fact questions, and neither are they a sufficient substitute for the clear and specific evidence required to establish a prima facie case under the TCPA." *Lipsky*, 460 S.W.3d at 592–93.

Beyond the "only went to Taylor" problem, Fitzgerald's affidavit in particular fails in other ways to establish a prima facie case that Taylor published the Alert. An expert's testimony is conclusory "when the expert asserts a conclusion with no basis." *Bombardier Aerospace Corp. v. SPEP Aircraft Holdings, LLC*, 572 S.W.3d 213, 223 (Tex. 2019) (citing *City of San Antonio v. Pollock*, 284 S.W.3d 809, 818) (Tex. 2009); *see Sw. Energy Prod. Co. v. Berry–Helfand*, 491 S.W.3d 699, 717 (Tex. 2016) (noting that expert opinion "cannot be considered probative evidence if it lacks a factual basis or is made in reliance on a basis that does not support the opinion."). Put differently, an expert's opinion may not be based on the expert's subjective interpretation of the facts. *Shaw v.*

38

*Wells Fargo Bank*, No. 02-20-00011-CV, 2020 WL 5241188, at *2 (Tex. App.—Fort Worth Sept. 3, 2020, no pet.) (mem. op.); *Hanson v. Greystar Dev. & Constr., LP*, 317 S.W.3d 850, 854 (Tex. App.—Fort Worth 2010, pet. denied) (citing *TXI Transp. Co. v. Hughes*, 306 S.W.3d 230, 239 (Tex. 2010)). In addition, "[w]hen an expert's opinion is based on assumed facts that vary materially from the actual, undisputed facts, the opinion is without probative value and cannot support a verdict or judgment." *Burroughs Wellcome Co. v. Crye*, 907 S.W.2d 497, 499 (Tex. 1995). And "even when some basis is offered for an opinion, if that basis does not, on its face, support the opinion, the opinion is still conclusory." *Pollock*, 284 S.W.3d at 817. Finally, if analytical gaps between the data and an expert's opinion are so great as to yield little more than a "trust me" situation, the expert's opinion fails. *See Elizondo v. Krist*, 415 S.W.3d 259, 264–65 (Tex. 2013).

Although Fitzgerald is a computer-forensics expert, he did not explain whether his resizing and overlaying the Handout and the Alert on the computer screen is an accepted and reliable methodology in his field for comparing documents and reaching conclusions about their source. He did not have metadata to compare; he did not have a computer file containing the Alert; and the Mogged Parties must not have produced anything relating to the Alert at all, because although Fitzgerald's affidavit refers to "additional documents" obtained in discovery, it says nothing about what they were. Instead, Fitzgerald simply opined that the Handout and the Alert were both "manipulated from the same electronic source document"—that is, from the

Lindamood deposition that Kayla's attorney (and perhaps others, including Kayla herself) possessed, and which the attorney emailed to Taylor (and perhaps others). It could also be that Kayla herself (or others) emailed it to others.

Equally speculative and conclusory is Fitzgerald's opinion, offered "[a]s a forensics expert," that "Michael Taylor was the only person who knew [Mandy's] name and contacted her to determine she did not want her name disclosed."[20] The fact that Taylor had redacted Mandy's name from the Handout does not mean that no one but Taylor could have done so in creating the Alert—and the Alert's claim that the family member "chose not to be identified" could have been made up out of whole cloth or merely assumed from the fact that the Handout redacted her name. Regardless, Fitzgerald provided no factual foundation for this conclusory statement, nor did he explain how forensic expertise came into play in forming his opinion.

In short, too many dots are left unconnected, too many inferences are needed, for us to conclude that Lindamood established a prima facie case that Taylor created, much less published, the Alert.

### 3. Fletcher's NextDoor post: not defamatory, no actual malice

The final alleged defamation is Fletcher's pseudonymous post on the NextDoor neighborhood forum in which he referred to Lindamood as a "sexual

---

[20]The Alert claimed that "[t]he name redacted is an underage family member that chose not to be identified." The Alert does not state whether that choice, if true, was made after the Alert's author contacted the family member or whether it was communicated to the Alert's author in some other fashion.

predator" and said that Colleyville should not vote for "ethical uncertainty." Unlike our analysis of the Alert, we examine both the false-statement-of-fact and actual-malice elements: because actual malice is subjective and because we know who allegedly defamed Lindamood with this post, we are able to discuss reckless disregard as an alternative reason for Lindamood's failure to establish a prima facie case.

### a. Fletcher's comments were opinions

Statements of opinion about a public figure on matters of public concern are not actionable as defamation because they cannot be proved false. *Bentley*, 94 S.W.3d at 579–80 (citing *Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 19–20, 110 S. Ct. 2695, 2706–07 (1990)). Whether a statement crosses the line between opinion and fact is a question of law. *Robertson v. Sw. Bell Yellow Pages, Inc.*, 190 S.W.3d 899, 903 (Tex. App.—Dallas 2006, no pet.). Although we have not located a Texas case interpreting whether calling someone a "sexual predator" is a falsifiable statement, courts in other jurisdictions have held this label to be opinion and thus not actionable. In New York, for example, the appellation "sex predator" is not a defamatory false statement of fact:

> By their very nature opinions are not "capable of being true or false." *Gross v. New York Times Co.*, 82 N.Y.2d 146, 155 (1993). Statements like "convicted felon," or "HIV positive" or "20-weeks pregnant" have objective, verifiable meaning; "sex predator" does not. Rather, it is the sort of "loose, figurative or hyperbolic" language that is immunized from defamation claims. *E.g., Dillon v. City of New York*, 261 A.D.2d 34, 38 (1st Dept. 1999). Indeed, sister-state judges have tossed out of court cases predicated on "sexual predator" language. *Burgoon v. Delahunt*, 2000 WL 1780285 (Minn. App.) (reasonable person could apply "sexual predator" to inappropriate touching and offensive sexual comments);

41

*Terry v. Davis Cmty. Church*, 131 Cal. App. 4th 1534, 1555 (2005) (inappropriate relationship with minor).

*Rosado v. Daily News, L.P.*, No. 157674/2013, slip op. at 3–4 (N.Y. Sup. Ct. filed Feb. 4, 2014).

We agree with our sister-state courts that have directly addressed this language, concluding that it falls within the broader principle that a speaker's individual judgment that "rests solely in the eye of the beholder" is mere opinion. *Falk & Mayfield, L.L.P. v. Molzan*, 974 S.W.2d 821, 824 (Tex. App.—Houston [14th Dist.] 1998, pet. denied).

We come to the same conclusion about Fletcher's statement that Colleyville citizens did not "need[] to vote for ethical uncertainty": Fletcher was voicing his opinion and not making a statement of verifiable or falsifiable fact. *See Milkovich*, 497 U.S. at 19–20, 110 S. Ct. at 2706; *Bentley*, 94 S.W.3d at 579. Unlike cases in which a speaker has explicitly called someone corrupt or a liar, *see Milkovich*, 497 U.S. at 18–19, 110 S. Ct. 2705–06, Fletcher's concern that a Lindamood victory might lead to ethical uncertainty is more like the situation in *Vice v. Kasprzak*, 318 S.W.3d 1 (Tex. App.—Houston [1st Dist.] 2009, pet. denied). There, a letter to the editor accused a homeowners' association president who was also legal counsel for the real-estate developer of engaging in "unethical business" by playing "both sides of the fence." *Id.* at 21–22. The appellate court held that this was the writer's opinion and thus not defamatory. *Id.* at 22.

### b. No actual malice in any event

Even if Fletcher's NextDoor post was defamatory, Lindamood still bore the burden to establish the subjective actual-malice element by clear and specific evidence. But because Fletcher's comments were reasonably derived from what Lindamood himself had said under oath in his deposition, they were neither knowingly false nor conveyed with reckless disregard for the truth, the alternative components of actual malice. *See Huckabee*, 19 S.W.3d at 420.

Fletcher's TCPA affidavit recited that he based his comments on the (nondefamatory) Handout and explained the opinions he formed from that document, including that "a married man who placed his hands on the private anatomy of a woman who is not his wife acted improperly" and "worried that such a person on Colleyville's City Council could act unethically." The deposition excerpts to which Fletcher alluded can be fairly read as disclosing not only that Lindamood had been in the presence of or otherwise interacted with a prostitute while in Las Vegas but also had fondled his stepsister while she was drunk and while he was married. We conclude that Lindamood's own admissions, coupled with Fletcher's stated understanding that depositions are sworn testimony, mean that Lindamood did not establish that Fletcher's comments were made with actual malice.

## C. The trial court did not err by granting the TCPA motion to dismiss

In sum, Lindamood has not made out a prima facie case of defamation against any of the Mogged Parties—a case, that is, that would "entitle [him] to recover if no

43

evidence to the contrary is offered by" any of the Mogged Parties. *Buckingham Senior Living Cmty., Inc. v. Washington*, 605 S.W.3d 800, 808 (Tex. App.—Houston [1st Dist.] 2020, no pet.). We affirm the trial court's dismissal of Lindamood's defamation claims against each of the Mogged Parties and now turn to the latter's appeal of the attorney's-fee and sanctions awards.

## V. The Mogged Parties' Appeal of Attorney's Fees and Sanctions

## A. Attorney's Fees

Movants who succeed in having claims against them dismissed under the TCPA are entitled to an award of "court costs, reasonable attorney's fees, and other expenses incurred in defending against the legal action as justice and equity may require." Tex. Civ. Prac. & Rem. Code Ann. § 27.009(a);[21] *see Sullivan*, 488 S.W.3d at 299 (stating that Chapter 27 requires award of reasonable attorney's fees to successful movant). The trial court has discretion in determining the amount of attorney's fees, but that discretion "does not also specifically include considerations of justice and equity." *Sullivan*, 488 S.W.3d at 299. Although the TCPA refers to "reasonable" fees rather than to "reasonable and necessary" fees, a claimant "wish[ing] to obtain attorney's fees from the opposing party . . . must prove that the requested fees are both reasonable and necessary" even if a statute, law, or contract uses only "reasonable" as the metric. *Rohrmoos Venture v. UTSW DVA Healthcare, LLP*,

---

[21]This TCPA subsection was amended in 2019. As throughout this opinion, we use the pre-amendment version.

44

578 S.W.3d 469, 489 (Tex. 2019). Under the TCPA, "reasonable" means "not excessive or extreme, but rather moderate or fair." *Sullivan*, 488 S.W.3d at 299 (quoting *Garcia v. Gomez*, 319 S.W.3d 638, 642 (Tex. 2010)).

The supreme court in *Rohrmoos* confirmed that the lodestar framework should apply to "any situation in which an objective calculation of reasonable hours worked times a reasonable rate can be employed." 578 S.W.3d at 498. As the court explained, "This base lodestar figure should approximate the reasonable value of legal services provided in prosecuting or defending the prevailing party's claim through the litigation process." *Id.* This base can be adjusted up or down in a "step two" based on consideration of the relevant *Arthur Andersen* factors, to the extent those factors were not already taken into account for purposes of the "step one" or base calculation. *Id.* at 500 (citing *Arthur Andersen & Co. v. Perry Equip. Corp.*, 945 S.W.2d 812, 818 (Tex. 1997)).

A trial court is not, of course, a mere rubber stamp or bean-counter; even when evidence of attorney's fees is uncontroverted, a trial court is not obligated to award the requested amount. *See Ragsdale v. Progressive Voters League*, 801 S.W.2d 880, 882 (Tex. 1990). And as part of its exercise of discretion, the court may "consider the entire record and common knowledge of the participants as lawyers and judges in making its determination." *In re A.M.*, No. 02-18-00412-CV, 2020 WL 3987578 at *4 (Tex. App.—Fort Worth June 4, 2020, no pet.) (mem. op.); *see Pro-Care Med. Ctr. & Injury Med. Grp. v. Quality Carriers, Inc.*, No. 14-18-01062-CV, 2020 WL 1617116 at

*3 (Tex. App.—Houston [14th Dist.] Apr. 2, 2020, no pet.) (mem. op.) (in Rule 91a case, affirming attorney's-fee award of $10,000 in face of request for over $53,000 and noting trial court's authority to apply his or her personal experience as a lawyer and judge); *Roach v. Turkia*, No. 05-18-00142-CV, 2019 WL 516742 at *4–5 (Tex. App.—Dallas Feb. 11, 2019, no pet.) (mem. op.) (noting that trial court may "look at the entire record and view the matter in light of the amount in controversy, the nature of the case, and its own common knowledge and experience as a lawyer and judge" and affirming award of $3,500 despite evidence of $11,000).

Here, the Mogged Parties used the lodestar method, addressed the *Arthur Andersen* factors, and presented detailed evidence of their attorney's fees, in contrast with those post-*Rohrmoos* TCPA cases in which fee awards have been remanded for trial courts to apply the clarified test. *See Robles v. Nichols*, No. 08-19-00225-CV, 2020 WL 4814209, at *7–8 (Tex. App.—El Paso Aug. 19, 2020, no pet.); *Toledo v. KBMT Operating Co., LLC*, 581 S.W.3d 324, 327 (Tex. App.—Beaumont 2019, no pet.). Beyond characterizing its award as encompassing "reasonable attorneys' fees," the trial court's order did not indicate why it reduced the requested fee award,[22] nor

---

[22]Lindamood's response to the Mogged Parties' fee request leaned heavily on notions of justice and equity as reasons to reduce the award. *Sullivan* was handed down after the parties' attorney's-fees briefing and after the February 2016 hearing but before the trial court entered its September 2016 order; the Mogged Parties brought it to the court's attention in the interim. Announcing its decision on fees and sanctions in a post-*Sullivan* letter ruling in June 2016, the trial court wrote: "This amount 'is one that is not excessive or extreme, but rather moderate or fair,'" and "'does not also specifically include considerations of justice and equity,'" quoting

did it make any written findings of fact and conclusions of law as the Mogged Parties requested.

Reduced attorney's-fee awards under the TCPA can be and have been upheld as a proper exercise of the trial court's discretion if conflicting evidence of their reasonableness exists. *See, e.g., Ruder v. Jordan*, No. 05-16-00742-CV, 2018 WL 672091, at *3 (Tex. App.—Dallas Feb. 2, 2018, no pet.) (mem. op.) (citing *Davis v. Huey*, 571 S.W.2d 859, 862 (Tex. 1978)). In *Ruder*, the successful TCPA movant requested over $30,000 in attorney's fees and nearly $5,500 for costs and expenses; the nonmovant countered with its attorney's affidavit arguing that some of the fees should have been segregated, that the time spent on some tasks was unreasonable, and that the fee charged was not the type customarily charged in that location for similar services. *Id.* at *2–4. The appellate court affirmed the award of only $9,000 for attorney's fees and $600 for costs, which the trial court had entered without explaining its reasoning, commenting that "the trial court had before it conflicting evidence raising a fact question on the reasonableness of the fees and expenses, and exercised its discretion in resolving that question." *Id.* at *4. Here, although Lindamood's response to the Mogged Parties' fee evidence was permeated with now-inoperative "justice and equity" considerations, Lindamood did challenge

*Sullivan.* This letter ruling does not, however, constitute formal findings and is not "competent evidence of the trial court's basis for judgment." *Bell Helicopter Textron, Inc. v. Burnett*, 552 S.W.3d 901, 911 n.7 (Tex. App.—Fort Worth 2018, pet. denied).

reasonableness on the basis of locality-driven hourly rates, as well as arguing that the Mogged Parties should not recover attorney's fees devoted to pursuing an unsuccessful motion for protective order and restraining order, nor for Poulos's fees, which Mogged's insurance company paid.

Nonetheless, based on the Mogged Parties' evidence, the trial court's award strikes us as factually insufficient—that is, against the great weight and preponderance of that evidence—and thus an abuse of discretion. *Bocquet v. Herring*, 972 S.W.2d 19, 21 (Tex. 1998) (holding that if attorney's-fee award is not grounded in factually sufficient evidence, trial court abuses its discretion). But rather than "usurp the trial court's discretion by determining whether the amount of attorney's fees requested was 'reasonable'" under the TCPA, *DeAngelis v. Protective Parent Coal.*, 556 S.W.3d 836, 862 (Tex. App.—Fort Worth 2018, no pet.), we conclude that the fee issue, including the trial court's award of conditional appellate attorney's fees, should be remanded for redetermination. In that way, the trial court can also apply *Rohrmoos*'s guidance, which it did not have when awarding fees initially and which might inform the fee award upon a second look at the Mogged Parties' detailed evidence of their attorney's fees. We express no opinion about what an appropriate fee award would be.

## B. Sanctions

In addition to awarding reasonable attorney's fees to a prevailing TCPA movant, the trial court must also impose sanctions against the nonmovant in an amount "sufficient to deter" the filing of similar actions. Tex. Civ. Prac. & Rem. Code

Ann. § 27.009(a). The Mogged Parties had suggested that a sanctions award of no less than half their attorney's fees would be appropriate; Lindamood countered that sanctions, if any, should be no more than $2,000. The trial court settled on $1,000 as "sufficient" to deter Lindamood and JR's Demolition from bringing similar actions.

Although Section 27.009 requires that a trial court award "some amount of sanctions, it ha[s] the discretion to award only a nominal amount, such as $1.00." *Rich v. Range Res. Corp.*, 535 S.W.3d 610, 613–14 (Tex. App.—Fort Worth 2017, pet. denied) (declining to remand trial court's failure to award any sanctions at all, because where trial court has discretion to award nominal amount of $1.00, appellate court will not reverse "merely to enable" such a recovery); *see ADB Int., LLC v. Wallace*, 606 S.W.3d 413, 443 (Tex. App.—Houston [1st Dist.] 2020, pet. filed) (citing *Rich* and noting trial court's "broad discretion" in awarding TCPA sanctions). In light of this broad discretion, we will not second-guess the trial court's sanctions award simply because the amount was below even what Lindamood had suggested.

## C. Request for Rule 296 findings and conclusions

Finally, the Mogged Parties claim that the trial court was obligated, upon request and after being timely reminded, to prepare findings of fact and conclusions of law relating to its order on attorney's fees, costs, and sanctions. *See* Tex. R. Civ. P. 296, 297. Whether the procedures for findings of fact and conclusions of law under Rules 296 through 299 apply in the TCPA context is an open question. *E.g.,* Amanda

49

G. Taylor & Sara B. Churchin, *TCPA Procedures: Statutory Requirements and Open Questions*, 84 The Advoc. (Tex.) 48, 51 (2018).

The TCPA explicitly requires findings in only one circumstance: "If the court awards sanctions under Section 27.009(b),[23] the court shall issue findings regarding whether the legal action was brought to deter or prevent the moving party from exercising constitutional rights and is brought for an improper purpose, including to harass or to cause unnecessary delay or to increase the cost of litigation." *See* Tex. Civ. Prac. & Rem. Code Ann. § 27.007(a). The Mogged Parties have disclaimed any reliance on Section 27.007. The TCPA "does not otherwise expressly address findings of fact and conclusions of law, but neither does it forbid them." *Greer v. Abraham*, 489 S.W.3d 440, 443 n.3 (Tex. 2016).

As we noted, whether a particular attorney's fee is reasonable under the TCPA is a "determination [that] rests within the court's sound discretion." *Sullivan*, 488 S.W.3d at 299. The same is true for sanctions. *Rich*, 535 S.W.3d at 613–14. When we review trial courts' rulings for an abuse of discretion, findings of fact and conclusions of law can be helpful, but they are not required. *E.g., Haddock v. Quinn*, 287 S.W.3d 158, 169 n.2 (Tex. App.—Fort Worth 2009, pet. denied). Accordingly, we

---

[23]This introductory clause was new in 2019; the former version of Section 27.007(a) began, "At the request of a party making a motion under Section 27.003, . . . ."

hold that the trial court had no absolute duty to enter findings of fact and conclusions of law in connection with its order on attorney's fees, costs, and sanctions.

## VI. Conclusion

We affirm the trial court's order dismissing Lindamood's claims against the Mogged Parties. We affirm that part of the trial court's separate order awarding sanctions in favor of the Mogged Parties and against Lindamood and JR's Demolition but reverse and remand to the trial court for a redetermination of the trial and appellate attorney's fees awardable to the Mogged Parties.

/s/ Elizabeth Kerr
Elizabeth Kerr
Justice

Delivered: December 3, 2020